UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY STAMM as Personal Representative
of the ESTATE OF CARL A. STAMM IV,

                  Plaintiff,                       Case No. 14-11951

vs                                              Hon. Judith E. Levy

FREDERICK MILLER, and the
VILLAGE OF FOWLERVILLE,
an agency of Michigan government,

                  Defendants.
_____/

HUGH M. DAVIS, Jr. (P12555)
CYNTHIA M. HEENAN (P53664)
Attorneys for Plaintiff
Constitutional Litigation Associates, P.C.
The Mercier Building
450 W. Fort Street, Suite 200
Detroit, MI  48226
(313) 961-2255; fax (313) 961-5999

ROBERT D. HORVATH (P27633)
Co-counsel for Plaintiff
2833 Crooks Road, Suite 104
Troy, MI  48084
(248) 614-4770; fax (248) 822-3174
Rdhjdlo@aol.com
_____/


**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


**PROOF OF SERVICE**

1.      Defendant Miller violated the 4th Amendment and caused Carl Stamm's death when he employed a rolling blockade against Stamm's motorcycle. The Defendant Village of Fowlerville is responsible for his unconstitutional wrongdoing.

2.      Having opposed the Defendants' motion for summary judgment (RE 18 as to RE 16), Plaintiff now asks for summary judgment on its 4th Amendment claim and corollary municipal liability claim because the core facts of liability cannot legitimately be disputed by the Defendants. Scott v Harris, 550 US 372, 380 (2007). They were recorded as events unfolded and they stand in marked contrast to Miller's after-the-fact exculpatory statements, including the defense offered for him in this litigation.

3.      In addition, because Miller changed his story of what happened, notably his claim afterwards (to the homicide detective[1]) that he was trying to get out of Stamm's way[2] when he

---

[1]      Miller omitted his pre-crash statement of what he was actually trying to do from both his interview with the homicide detective 3 hours after the crash (RE 18-14) and his written report filed shortly after the interview. (The latter is attached as Exhibit 3.) Not only are those omissions (of what he really said he was trying to do) reflective of a consciousness of guilt, his changed story creates a presumption of liability as noted in the text above.

[2]      The detective asked why he hadn't stayed in the right lane as instructed by pursuit, and Miller said: (RE 18-14, Exhibit 10, p 12, line 5) ".. I tried to get over so he could just go straight on through." Which repeated what he told the detective about his action and the timing of the collision (Id. p 4, lines 3-5): "... I'm going to give you this lane so he can go around me, and so I moved – started to move over a little bit and he may have followed me, and bang, all the sudden that's when I hit."

He repeated he was getting out of the way, speeding up to do so (Id. p 16, lines 14-18): "... I know they're getting close now, and so I sped up, so. And then all the sudden, man, he was right there. And I said, all right, I got to get out of the way, so I moved out of the way. Or I started -- I think the impact happened like as I started to move."

But the audio and visual record tells us he did not say he was getting out of the way, just the opposite, and the collision did not happen as he started to move. It occurred more than 16 seconds after he saw Stamm behind him, and only after he moved almost 900 feet down the freeway, after he positioned himself over the centerline of the freeway and only after he slowed to 31 MPH braking twice just before impact, after Stamm had moved into the second lane.

explicitly said prior to the collision: "I'll try and stay in front of him," his self-contradiction means under the standard rule of evidence, <u>Reeves v Sanderson</u>, 530  US 133, 147 (2000), there is a presumption of culpability as this case stands. Thus, this evidentiary principle and the audio-visual record overcomes the typical standard of review for assessment of summary judgment that would otherwise favor the non-movant.

4.     As shown in Plaintiff's summary judgment response (RE 18), Defendant Miller used a dangerous tactic of pursuit, a rolling blockade, and stopped Stamm's motorcycle by moving, and slowing down, in front of Stamm producing a deadly collision (motor vehicle force). The facts demonstrate Stamm had a clear lane of travel available to him and would have passed Miller's patrol car except that Miller, while continuing to go forward on the I-96 freeway (east to west) drove his car, laterally (north to south), from the right lane into the left lane and straddled the centerline of the freeway blocking both lanes of travel while reducing his speed to 31 MPH at impact. This was not split-second inadvertent action – Miller caused the collision, having traveled almost 900 feet forward on the freeway, over 16 seconds (after first seeing Stamm's motorcycle behind him in the right lane) and then moving sideways, in the last moments, into what would have been an open lane for Stamm so that his vehicle stayed in front of the motorcycle. He did what he said he would do.

5.     Miller's actions are measured from an objective standpoint from the perspective of the person subjected to his actions. <u>Brendlin v California</u>, 551 US 249, 260-61 (2007): "The intent that counts under the Fourth Amendment is the 'intent [that] has been conveyed to the person confronted,' and the criterion of willful restriction on freedom of movement is no invitation to look to subjective intent when determining who is seized."

6.     That Miller killed Stamm without a conscious intent to do so (although his, recorded,

2

pre-crash comment indicates otherwise) does not mean his actions were not wilful. Rodriguez v Passinault, 637 F3d 675 (6th Cir. 2011)(intent to do the act, rather than a certain consequence). And, although intent might ordinarily be viewed as an issue for the jury, Walker v Davis, 649 F3d 502 (6th Cir. 2011), Miller's words and actions signify beyond any plausible doubt that he was trying to stop Stamm *via* a dangerous tactic that was likely to cause death. Stamm was a deliberate object of Miller's use of (motor vehicle) force and thus was seized when Miller acted as he did. Fisher v City of Memphis, 234 F3d 312, 317-18 (6th Cir. 2000) and Claybrook v Birchwell, 199 F3d 350, 359 (6th Cir.2000). See also Pleasant v Zamieski, 895 F2d 272, 276-77 (6th Cir. 1990)(seizure by virtue of purposeful act of drawing weapon even though harm was accidentally caused when gun inadvertently discharged).

7.      The Defendant Village of Fowlerville is responsible for Miller's unconstitutional act under Monell v Dept. of Soc. Servs., 436 US 386 (1978)(unconstitutional policy), Canton v Harris, 489 US 378 (1989)(obvious shortcomings in supervision (*i.e.*, allowing a known unfit officer to have deadly force power) or training (*i.e.*, failing to provide any live pursuit instruction) producing attribution of employee wrongdoer, or St. Louis v Praprotnik, 485 US 112, 127 (1988)(ratification).

a.      Under its formal policy, Fowlerville allowed officers to use rolling blockades against motorcycles in mere traffic pursuits – meaning deadly force was authorized in circumstances forbidden by Tennessee v Garner, 471 US 1, 11 (1985) and so Miller's *de facto* use of a rolling blockade that killed Stamm was the result of an unconstitutional policy for which Fowlerville is liable. Monell v Dept. of Soc. Servs., *supra*.

b.      Based on a department assessment of him in 2006, Fowlerville knew Miller was unfit for police tasks such as high speed pursuits (life and death decision-making) – Fowlerville thus had

"specific awareness" that constitutional violations were likely on his part and yet allowed him to exercise full police powers. (The department psychologist informed the chief of police of Miller's cognitive unfitness. The chief of police had already identified shortcomings in this context.) Miller's *de facto* use of a rolling blockade, a life and death tactic of police pursuit, which killed Stamm was the result of Fowlerville's deliberate indifference to his likely misuse of deadly force (known unfitness for that task) for which Fowlerville is liable. Canton v Harris, *supra*. In addition, Fowlerville did not give Miller any training for high speed pursuits but expected him to carry them out (having failed to regard his individual cognitive unfitness) – thus it was obvious constitutional violations would occur given the required  job task, its high level of danger and the absence of necessary training to carry out this very dangerous aspect of police work.[3] Fowlerville was deliberately indifferent to Miller's lack of fitness (training) for using motor vehicle force, making it liable for his misuse of a rolling blockade that killed Stamm. Canton v Harris, *supra*.

    c.    Fowlerville ratified Miller's wrongful actions by failing to review them internally[4] (the chief of police saying they were justified following an outside criminal investigation of Miller for homicide charges which assessed criminal intent only).

    8.    Therefore Plaintiff asks the Court to find that Defendant Miller committed a 4th

---

[3]    Fowlerville's force and pursuit policies, adopted in 2009, identified the danger of rolling blockades and their equivalence to deadly force. Thus the obviousness of constitutional harm from poor performance due to the absence of suitable training or inherent personal deficiencies (officer fitness) exists. In addition, MCOLES identified pursuit and use of force tasks as highly dangerous, where inadequate performance leads to disastrous consequences. This demonstrates Fowlerville's "specific awareness" of probable constitutional violations.

[4]    St. Louis v Praprotnik, *supra* at127: "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."

Amendment violation[5] when he used a rolling blockade that killed Carl Stamm and that the Defendant Village of Fowlerville is responsible for his wrongdoing.

8.      A brief in support accompanies this response. Attached exhibits 1 to 4 are: Dr. Alpert's affidavit, Ernest Burwell's affidavit, Defendant Miller's incident report and statement of Kellogg Hotel & Banquet  Center (Stamm's employer – he was schedule to work at 6 a.m. the morning of his death). (Other materials are incorporated by reference; see RE 16 & supporting exhibits and RE 18 & supporting exhibits.)

9.      Plaintiff sought concurrence regarding this motion, but it was not afforded, Defendants having elected to file their own motion for summary judgment, RE 16.


_____
s/Robert D. Horvath (P27633)
Co-counsel for Plaintiff

Dated: January 20, 2015

---

[5]      Wrestling with the fact that he killed a motorist wanted only for a traffic offense (RE 18-14, p 15: "I'm chasing one going a hundred and four" & "the only want was for the speed" ), he offered an explanation to the detective that revealed he had not intended to let Stamm get by him, *Id*: "I mean, you know, our experience tells us that the guy could have just robbed a place." Miller chose to ignore the known facts, *Id*.: "Well, um, I didn't limit myself or that incident to just that [*i.e.* speed]." After this dialogue, he then falsely asserted, *Id*.: "There was no [radio] traffic to indicate one way or the other [the reason for the pursuit]."

Miller's state of mind is clear. Which shows, consistent with his actions, that he had no intention of letting Stamm get by him because you just never know: Stamm could have been John Dillinger. In fact, he was a college kid going home to get ready for work who made a foolish mistake in trying to avoid a ticket or other charge. (Stamm was scheduled to work at 6 a.m. See Exhibit 4.) The known circumstances of this chase did not warrant deadly force.

It is no coincidence that Miller exposed this mindset to the detective, and did what he did, having told the department psychologist in 2006 that the police were the "judge, jury and executioner." RE 18-3, Exhibit 1 B, Pg ID 187.

**PROOF OF SERVICE**

The undersigned certifies that on the aforementioned date this document was
served on counsel of record via the Court's ECF System.

_____

s/Robert D. Horvath

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY STAMM as Personal Representative
of the ESTATE OF CARL A. STAMM IV,

                    Plaintiff,                           Case No. 14-11951

vs                                               Hon. Judith E. Levy
FREDERICK MILLER, and the
VILLAGE OF FOWLERVILLE,
an agency of Michigan government,

                    Defendants.

_____/

**BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

Statement of Facts

       Plaintiff has outlined the facts and underlying material for them in the Response (RE 18) to

Defendants' Motion for Summary Judgment (RE 16); that response/material is incorporated by

reference.

       Miller's actions constituted a rolling blockade,[6] which violated Stamm's 4th Amendment

rights since deadly force was not warranted.[7] His exculpatory statements afterwards conflict with the

---

    [6]  Exhibits 1 and 2 are affidavits from Plaintiff's experts who have reviewed case
materials and opined that Miller unnecessarily used a rolling blockade that killed Stamm.

    [7]  First acknowledging but then ignoring the information he got over the radio about the
pursuit ("I'm chasing one going a hundred and four" and "the only want was for the speed") and
then trying to justify Stamm's death, Miller told the homicide detective that Stamm might have
been a robber, fleeing from his crime. Miller thus chose to disregard the known facts. ("Well,
um, I didn't limit myself or that incident to just that [*i.e.* speed]." ) RE 18-14, Exhibit 10, p 15.
    An officer cannot use deadly force because of subjective speculation about the victim.
Miller's "explanation" to the detective underscores his unfitness to carry out life and death
decision-making identified in 2006. RE 18-2, Exhibit 1 A, Pg ID 184 (Chief Goss's statement of

1

audio and visual record[8] and cannot create a legitimate issue of dispute to avoid summary judgment.

Scott v Harris, 550 US 372, 380 (2007).

---

deficiencies in his judgment and problem-solving) and RE 18-3, Exhibit 1 B, Pg ID 185 (Dr. Forsberg's determination of his incapacity to be fully rehabilitated due to "minimal cognitive ability" with "poor critical thinking" "not adequate for complex situations" ).

It is not coincidence that Miller, as he informed the department psychologist in 2006, held the view that the police are: "judge, jury and executioner." RE 18-3, Exhibit 1 B, Pg ID 187,

[8]         Screen shots from his in-car video (RE 18-16, Exhibit 12) report his speed hovered at 36 to 35 MPH as he waited for Stamm; these are frames 1 to 6 (Pg ID 594 to 599) which encompass the first 6 seconds on the video (4:20:55 to 4:21:00). He increased his speed slightly, getting up to 43 MPH, after seeing the motorcycle at 4:21:00, frames 7 through 12 (Pg ID 600 to 605) which encompass the next 6 seconds (4:21:01 to 4:21:06 – the latter is when he put on his overhead lights, as shown in frame 12, PG ID 605).

He braked: at 4:21:04 (frame 10, Pg ID 603), at 4:21:07 (frame 13, Pg ID 606), 4:21:09 (frame 15, Pg ID 608) and at 4:21:12 (frame 18, Pg ID 611) so that his speed as of 4:21:12 (18 seconds of video) was 34 MPH. (Which is when he first straddled the centerline.) His last braking prior to the collision is reported in frame 22 (Pg ID 615) at 4:21:15, with his speed at 31 MPH, with the right brush guard of his car over the centerline. He did not stop braking until after the crash, frame 30 (Pg ID 623).

At 4:21:11, frame 17 (Pg ID 610) shows his car moving to the left, the left brush guard near the centerline. At 4:21:12, frame 18 (Pg ID 611) shows his car even more to the left, now over the centerline of the freeway (straddling the two lanes as the investigator described it). Frames 19 and 20, 4:21:13 & 4:21:14 respectively (Pg ID 612 & 613), continue to show the straddling over the centerline, the latter depicting his car as slightly more to the left. His speed has dropped to 31 MPH where it remained until the collision.

At 4:21:15, frame 21 (Pg ID 614) shows his right brush guard over the centerline, which puts his car more into the left lane while still in the right lane. This position is the farthest he gets into the left lane. (See frames 22 & 23 which are within the 4:21:15 interval, Pg ID 615 & 616).

At 4:21:16, frame 24 (Pg ID 617) shows a slight move to the right, with the right brush guard over the centerline. In the same interval of time (4:21:16), frames 25 through 28 (Pg ID 618 to 621) show movement to the right with the last two (frames 27 & 28, PG ID 620 & 621) showing the car right over the centerline.

Then frame 29 (Pg ID 622), at 4:21:17, shows the immediate aftermath of the collision, the patrol car moving or being pushed more to the right, with the left brush guard over/near the centerline. The left side of the patrol car was still in the left lane when the collision occurred just off the centerline in the left lane of the freeway. (See RE 16-11, Pg ID 151, crash diagram by Chad Sell.)

The debris field from the motorcycle shows Stamm was moving left to right at impact, RE 18-13, Sell deposition, p 39 to p 40 (lines 2-3). The screen shots, as noted, show Miller's final movements were also left to right. He kept in front of Stamm until the impact.

2

The facts of blockade: without any training to do so, he got out in front of a freeway pursuit of Stamm's motorcycle, waited for the motorcycle to come up behind him and said just before the collision: I'll try and stay in front of him.

- Stamm's reported speed was 104 MPH.

- Miller asked the pursuit deputy if wanted him to "jump on in;" the deputy told him to do so and to stay in the right lane as they would be going by him "pretty quick."

- Miller drove onto the I-96 freeway (which has two lanes of travel in this area, which is west of the Fowlerville overpass) and positioned himself in the right lane.

- He saw the motorcycle behind him in the right lane (4:21:00), his speed was 36 MPH.

- He turned on his overheads (4:21:06) – reporting that fact over the radio and then said: I'll try and stay in front of him.

- Stamm in response to Miller's position moved toward the centerline at 4:21:08 (Sell's investigation, RE 16-13, Pg ID 125) and at 4:21:10 was in the second (left) lane. *Id*.

- Miller started to move to the left (4:21:11) and straddled the centerline of the freeway (4:21:12).[9]

- Doing so, Miller did not vacate the right lane while impeding Stamm's path in the left lane.

- Stamm, apparently reacting to Miller's move to the left, was trying to go to the right

_____

[9]   Miller admitted at his deposition that Stamm had a clear path around him when Stamm got into the second lane. RE 18-12, Exhibit 8, Deposition pp 98-99.

3

just before the collision since Miller had moved the majority of his vehicle to the left, his position as late as 4:21:15.

- But Miller's last move, traveling 31 MPH having braked 5 times *per* the video record (the last braking at 4:21:15) was also to the right and then Stamm hit the far left side of Miller's vehicle in the left lane of travel, just off the centerline. (Chad Sell, the investigator, testified the point of impact was approximately 1 foot into the second lane, RE18-13, Deposition p 29, line 17.)

- Miller's last comment before the crash was "I'll try and stay in front of him" (Sell Deposition, p 89)

- Sell testified, *Id*., p 36, that Stamm needed only another 2-3 feet to avoid the collision. [Thus Miller's reduced speed, braking twice just before impact, and centerline position were crucial in causing the crash.]

In short, Miller did what he said he would do. He waited for Stamm, stayed in front of him, moved laterally into the second lane without vacating the first lane after Stamm had changed lanes, slowed his vehicle to 31 MPH while straddling the centerline of the freeway.[10] And in the very last

---

[10]     The detective asked why he hadn't stayed in the right lane as instructed by pursuit, and Miller said: (RE 18-14, Exhibit 10, p 12, line 5) ".. I tried to get over so he could just go straight on through." Which repeated his claim about his action and the timing of the collision (*Id*. p 4, lines 3-5): "... I'm going to give you this lane so he can go around me, and so **I moved – started to move over a little bit** and he may have followed me, **and bang, all the sudden that's when I hit**." (bold added)

He told the detective he was speeding up and getting out of the way, saying (*Id*. p 16, lines 14-18): "... I know they're getting close now, and so I sped up, so. And then all the sudden, man, he was right there. And I said, all right, I got to get out of the way, so I moved out of the way. Or I started -- **I think the impact happened like as I started to move**." (bold added)

However, the audio and visual record tells us he did not say he was getting out of the way, just the opposite, and the collision did not happen ("bang, all the sudden that's when I hit") as he started to move. It occurred more than 16 seconds after he saw Stamm coming up behind

moment, as Stamm tried to go around him to the right, Miller moved in that direction – applying the brakes one last time which made the respective positions of the two vehicles even closer in that last act of blocking Stamm's attempt to get away. Miller's braking actions were the most critical acts that caused Stamm to hit the squad car; had Miller not braked the last two times (4:21:12 and 4:21:15) and particularly the last time, one second before impact, the facts show Stamm would have gotten by him (the point of impact being at the very left side of the patrol car). Miller killed him. It was not an accident.

Miller omitted his pre-crash statement of what he was actually trying to do in stopping Stamm from both his interview with the homicide detective roughly 3 hours after the crash and his written report filed shortly after the interview.[11] Not only is that omission (of what he had said) reflective of a consciousness of guilt, his changed story[12] creates a presumption of liability. Reeves v Sanderson, 530 US 133, 147 (2000).

Fowlerville's use of force and vehicle operations policies are Exhibits 2 and 3 respectively in the materials filed for Plaintiff's Summary Judgment Response, RE 18, being RE 18-4 and RE 18-5. Rolling blockades are recognized as motor vehicle force equated with deadly force because

---

him. And after he moved almost 900 feet down the freeway, after he positioned himself over the centerline of the freeway and after he slowed to 31 MPH braking twice just before impact, after Stamm had moved into the second lane.

[11]   He knew before he left the scene that Stamm was dead. RE 18-12, Exhibit 8, Miller Deposition p 18; the homicide interview preceded his written report by a few hours that morning. *Id.* at 15.

[12]   He twice told the homicide detective that, as the action unfolded, he said he was going to get out of the way.  "And so I stayed in the right lane until I seen him coming up on me. **I said I've got to give him some room**, because I didn't want him smoking me, so I tried to get over so he could just go straight on through." (bold added) *Id.*, p 12, lines 3 - 5; he repeated this claim, p 16, lines 13 - 18. Of course what he said was just the opposite.

blockades create a "high probability of contact" with a "high probability of causing death." Pg ID 189. Blockades are discouraged, confined to "last resort" circumstances (Pg ID 199 & 200) and should not be used unless the motorist has an opportunity to see and react to it. (Pg ID 199.) Motorcycles are recognized as particularly vulnerable in "contact" tactics, with stop stick usage banned completely against them. Pg ID 203.  But not rolling blockades.

Chief Couling testified that Fowlerville's policy recognized that certain tactics of apprehension (stop sticks) were too dangerous to use against a motorcycle because of the high probability of causing a crash if used, RE 18-11, Exhibit 7, Deposition p 46. Yet, he acknowledged that a rolling blockade could be used *per* policy against a motorcycle wanted only for a traffic violation. *Id*, Deposition p 48 to 49 (lines 1 to 14). Since a rolling blockade is motor vehicle force equated with deadly force under the terms of formal policy, Fowlerville authorizes deadly force against a motorcyclist when not warranted by the narrow circumstances of <u>Tennessee v Garner,</u> 471 US 1, 11 (1985) .

In 2006, Miller became psychologically unstable and the chief of police (Gary Goss) required an examination by the department's psychologist (Dr. Linda Forsberg). Goss sent the doctor his assessment of Miller's shortcomings and Dr. Forsberg made her own determinations. Miller's emotional instability in 2006 thus served to demonstrate to Fowlerville that he had inherent deficiencies which precluded safe performance of job tasks expected of any police officer, particularly the exercise of deadly force by Miller. He was unfit.

Goss said Miller was moderately deficient in two important areas: "judgment" (defined to include "life and death" situations) and "problem solving" (defined to include acting with "foresight" and making "timely, good quality decisions"). Goss also said that he was "unsure:" whether Miller

had the "emotional stability" to perform effectively in stressful situations; whether Miller could restrain himself from overreacting; and, whether Miller could exercise restraint in using the minimum of force in a given situation.  RE 18-2, Exhibit 1 A, Pg ID 184 & 185.

Dr. Forsberg said Miller was psychologically stable in March 2006 but expressed the view that he could not be "fully rehabilitated" due to Miller's "minimal cognitive ability" saying: "This means that he will have difficulty understanding subtleties or complexities of a situation. His overall problem-solving ability and judgment are likely to be adequate for routine matters, but not for complex situations." She went on to say that Miller had "poor critical thinking."  Dr. Forsberg also said Miller should be "closely monitored" and required "repeated instruction." And because Miller had told her the police are the "judge, jury and executioner" the doctor said his department had to remind him [repeatedly] that he did not have those powers. RE 18-2, Exhibit 1 B, Pg ID 186 & 187.

In addition, to his inherent unfitness for police work which it identified in 2006, Fowlerville failed to train him for the dangerous job task of freeway patrol/pursuit although he was expected to carry out "motor vehicle force" and "deadly" tactics as formal policy established, RE 18-4 and 18-5, Exhibits 2 and 3, respectively. Although stating he knew that motor vehicle force was the equivalent of deadly force (RE 18-12, Exhibit 8, Miller Deposition, p 59), Miller testified he had no such training. RE 18-12, Exhibit 8, Deposition pp 58-59, 61 (no training for high speed pursuits of any kind, whether involving a motorcycle or not). His attempt to stop Stamm the morning of May 17, 2011 was the first and only time he had gotten out ahead of a pursuit to bring it to an end. *Id.* at 26.

Fowlerville thus knew of the very dangerous risks of pursuits but failed to provide suitable training. This job task was one also identified by MCOLES in 2006 as likely to have disastrous consequences due to inadequate performance. RE 18-15, Exhibit 11, Pg ID 591, 592-593.

7

(Emergency vehicle operation and use of deadly force are two of the most "critical" patrol officer duties where "inadequate performance" has very serious or disastrous consequences.) Thus, the absence of suitable training was a recipe for disaster.

Fowlerville specifically knew Miller was personally unfit and Fowlerville knew (both actually and constructively) that training was required for safe performance of freeway pursuits. Tasking Miller with this performance-requirement was reckless and deliberately indifferent to the harm that was predicted to happen and did happen.

## ARGUMENT I

### MILLER VIOLATED THE 4TH AMENDMENT WHEN HE USED MOTOR VEHICLE FORCE AGAINST A MOTORCYCLIST WHEN DEADLY FORCE WAS NOT WARRANTED.

The objective facts, which Miller cannot dispute, show that he did what he said he would do. He got in front of Stamm and blocked his path, slowing down to 31 MPH and straddling the centerline of the freeway after announcing over the radio that he was going to try and stay in front of the motorcycle. He was trying to stop this motorcycle and had no intention of letting him pass, telling the homicide detective Stamm might have been fleeing from a robbery despite what he actually knew of the reason for the pursuit. Miller was unfit to engage in freeway pursuits, having no training for this life and death job task and suffering from personal deficiencies that prevented him from exercising sound judgment for this critical task.

Miller's actions are measured from an objective standpoint from the perspective of the person subjected to his actions. Brendlin v California, 551 US 249, 260-61 (2007): "The intent that counts under the Fourth Amendment is the 'intent [that] has been conveyed to the person confronted,' and the criterion of willful restriction on freedom of movement is no invitation to look

to subjective intent when determining who is seized."

     That Miller killed Stamm without a conscious intent to do so (which is highly debatable in view of his, recorded, pre-crash comment[13]) does not mean his actions were not wilful. <u>Rodriguez v Passinault</u>, 637 F3d 675 (6th Cir. 2011)(intent to do the act, rather than a certain consequence). And, although intent might ordinarily be viewed as an issue for the jury, <u>Walker v Davis</u>, 649 F3d 502 (6th Cir. 2011), Miller's words and actions signify beyond any plausible doubt that he was trying to stop Stamm *via* a dangerous tactic that was likely to cause death. Stamm was a deliberate object of Miller's use of (motor vehicle) force and thus was seized when Miller acted as he did. <u>Fisher v City of Memphis</u>, 234 F3d 312, 317-18 (6th Cir. 2000) and <u>Claybrook v Birchwell</u>, 199 F3d 350, 359 (6th Cir.2000). See also <u>Pleasant v Zamieski</u>, 895 F2d 272, 276-77 (6th Cir. 1990)(seizure by virtue of purposeful act of drawing weapon even though harm was accidentally caused when gun inadvertently discharged).

     Fowlerville policy recognized that motor vehicle force is equivalent to deadly force and that roadblocks create a high probability of contact, with a high probability of causing death. RE 18-4, Exhibit 2, Pg ID 189. Roadblocks were not supposed to be used without supervisory approval but Miller "jumped into" this pursuit and then took the very actions that were predicted by his department's policy as leading to a fatal outcome, ones not to be taken except when "last resort"

---

[13]   His statement to the homicide detective, describing what he knew of the reason for stopping Stamm, *i.e.*, excessive speed, shows Miller had no intention of letting Stamm get by him because: "the guy could have just robbed a place."  RE 18-14, Exhibit 10, p 15.

In fact, Stamm was a college kid going home for work who made a foolish mistake in running from police. (Exhibit 4 is a statement from Angela Thompson for the Kellogg Hotel & Banquet Center where Stamm was a server; he was scheduled to work at 6 a.m. that morning.)

Miller's view of his police experience – the types of possible felons he might encounter – as a justification for one or another police tactic of apprehension, conflict with deadly force restrictions. The <u>known</u> circumstances of this chase did not warrant deadly force.

circumstances existed, *i.e.*, those justifying deadly force, which were absent here. RE 18-5, Exhibit 3, Pg ID 199 to 203.

Miller employed a rolling roadblock against a motorcyclist, a circumstance of deadly inevitability given the vulnerability of the rider. Miller knew that Stamm was wanted only for speed and that deadly force was unwarranted which is why he changed his story afterwards, from purposeful action (I'll try and stay in front of him) to unfortunate collision (I was trying to get out of his way). This was a 4th Amendment violation for which Miller does not have immunity. Walker v Davis, *supra*.

## ARGUMENT II

**THE VILLAGE OF FOWLERVILLE IS RESPONSIBLE FOR MILLER'S WRONGDOING UNDER:**

**MONELL V DEPT. OF SOC. SERVS.**, **436 US 386 (1978) SINCE ITS PURSUIT POLICY IS UNCONSTITUTIONAL AS IT ALLOWED DEADLY FORCE TO BE USED AGAINST A MOTORCYCLE IN THE ABSENCE OF JUSTIFYING CIRCUMSTANCES;**

**CANTON V HARRIS**, **489 US 378 (1989) AS ITS SUPERVISION OF HIM WAS OBVIOUSLY DEFICIENT, SHOWING DELIBERATE INDIFFERENCE TO THIS OFFICER'S KNOWN UNFITNESS TO EXERCISE DEADLY FORCE OR AS ITS TRAINING OF HIM WAS OBVIOUSLY DEFICIENT, HAVING FAILED TO PROVIDE ANY LIVE FREEWAY PURSUIT INSTRUCTION; AND/OR,**

**ST. LOUIS V PRAPROTNIK**, **485 US 112, 127 (1988) THE CHIEF OF POLICE HAVING RATIFIED HIS WRONGDOING**.

Direct Liability: Pursuit Policy Authorizes Unnecessary Deadly Force Against Motorcycles

Current Chief of Police Couling testified that Fowlerville's policy recognized that certain tactics of apprehension (stop sticks) were too dangerous to use against a motorcycle because of the

high probability of causing a crash if used, RE 18-11, Exhibit 7, Deposition p 46. Yet, he acknowledged that a rolling blockade could be used *per* policy against a motorcycle wanted only for a traffic violation. *Id*, Deposition p 48 to 49 (lines 1 to 14). Since a rolling blockade is motor vehicle force equated with deadly force under the terms of formal policy, Fowlerville authorizes deadly force against a motorcyclist when not warranted by the narrow circumstances of <u>Tennessee v Garner</u>, *supra*.

Official policy thus is responsible for Miller's act of "rolling blockade" that unnecessarily resulted in Stamm's death. The link between an official policy of unconstitutionality and the employee's unconstitutional act in the circumstance is clear and direct, just as in <u>Monell v Dept. of Soc. Servs.</u>, *supra*. See also, for example, <u>Hublick v Otsego County</u>, Case No. 12-14146 (Hon. Thomas Ludington), RE 42, Opinion & Order Granting & Denying in Part Defendants' Motion for Summary Judgment, 2/6/14, p 17 therein.[14]

<u>Fowlerville's Deliberate Indifference: Supervision & Training were Obviously Deficient</u>

Based on the department's assessment of him in 2006 after he suffered a psychological breakdown, Fowlerville knew Miller was unfit for police tasks such as high speed pursuits (life and death decision-making). Fowlerville thus had "specific awareness" that constitutional violations were likely on his part, <u>Alman v Westland</u>, 703 F3d 887 (6th Cir. 2013), and yet allowed him to exercise full police powers. (As outlined in the Statement of Facts, *supra*, the department psychologist informed the chief of police of Miller's cognitive unfitness. The chief of police had already identified

---

[14]    "The policy of permitting the tasing of inmates who are verbally non-compliant—but not actively resisting or putting officers in danger—without consideration of the circumstances has the "highly predictable consequences" of resulting in constitutional violations. *See Brown*, 520 U.S. at 409. A municipality with a custom or practice of permitting tasing of verbally noncompliant inmates therefore opens itself up to § 1983 liability."

shortcomings in this context.)

Miller's *de facto* use of a rolling blockade, a life and death tactic of police pursuit, which killed Stamm was the result of Fowlerville's deliberate indifference to his likely misuse of deadly force (known unfitness for that task) for which Fowlerville is liable. Canton v Harris, *supra*.

In addition, Fowlerville did not give Miller any training for high speed pursuits but expected him to carry them out (having failed to regard his individual cognitive unfitness). Thus it was obvious constitutional violations would occur given the required  job task, its high level of danger and the absence of necessary training to carry out this very dangerous aspect of police work.[15] Fowlerville was deliberately indifference to Miller's lack of fitness (training) for using motor vehicle force, making it liable for his predictable misuse of a rolling blockade that killed Stamm. Canton v Harris, *supra*.

Fowlerville's Ratification of Miller's Wrongful Act

St. Louis v Praprotnik, *supra*, provides direct liability due to a policy-maker's (the police chief's) after-the-fact ratification of Miller's unconstitutional act.[16] Fowlerville ratified Miller's wrongful actions by failing to review them *per* its internal requirements and by the chief of police's conclusion that they were justified, which relied on an outside criminal investigation of Miller for

---

[15]   Fowlerville's force and pursuit policies, adopted in 2009, identified the danger of rolling blockades and their equivalence to deadly force. Thus the obviousness of constitutional harm from poor performance due to the absence of suitable training or inherent personal deficiencies (officer fitness) exists. In addition, MCOLES identified pursuit and use of force tasks as highly dangerous, where inadequate performance leads to disastrous consequences. This demonstrates Fowlerville's "specific awareness" of probable constitutional violations.

[16]   *Id*. at127: "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."

homicide charges which assessed criminal intent only.

Contrary to written policy, whenever a Fowlerville officer uses deadly force or becomes involved in a pursuit, specific report forms are to be filed. None were at bar. RE 18-7, Exhibit 7, Couling Deposition, p 15. And when deadly force is used, the department is supposed to convene an internal review panel to make findings. *Id*. at p 16. That also did not occur at bar, Couling approving of Miller's actions based on the criminal investigation. *Id*. at p 17. The Defendant Village of Fowlerville therefore may be held accountable. See, for example, the opinion of the district court for the middle district of Florida in <u>Salvato v Blair</u>, Case No. 12-635 (MD FL) RE 142, Order on Motions for Summary Judgment, 5/12/14, pp 30-31. (An outside criminal investigation, as at bar, does not excuse internal review.)

<u>Conclusions</u>

Defendant Miller did what he said he would do and violated Carl Stamm's 4th Amendment rights by employing a tactic of apprehension, a rolling blockade of a motorcycle, which was known to be highly dangerous and likely to cause death, when deadly force was unwarranted since Stamm was wanted only for excessive speed.

Defendant Village of Fowlerville is responsible for Miller's unconstitutional act. Fowlerville authorized the use of rolling blockades against motorcycles when deadly force circumstances were absent and Miller acted under that policy. Fowlerville was deliberately indifferent to Miller's unfitness for deadly force situations; it actually knew in 2006 he was unfit for life and death decision-making and he had no training for high risk police tasks such as freeway pursuits. It was thus virtually inevitable that such an unfit officer would misuse his deadly-force power in a freeway pursuit of a high speed motorcycle. And, Fowlerville ratified Miller's misconduct through its failure

to conduct an internal review (required by policy) and by express affirmation of his wrongdoing.

Carl Stamm's death was not happenstance, it was predicted by Fowlerville's own force and pursuit policies, by Dr. Forsberg and by the MCOLES 2006 study of critical tasks (poor performance produces disastrous consequences). Tragically, it was predicted by Miller himself: he was the "judge, jury and executioner."

                        _____

                        s/Robert D. Horvath (P27633)
                        Co-counsel for Plaintiff

Dated: January 20, 2015