# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTICT OF MICHIGAN
# SOUTHERN DIVISION

Mary Stamm, as personal
representative of the Estate of
Carl A. Stamm, IV,

       Plaintiff,          Case No. 14-cv-11951
                                Hon. Judith E. Levy
    v.                     Mag. Judge Michael J. Hluchaniuk

Frederick Miller, and the Village
of Fowlerville,

       Defendants.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [19] AND DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [16]

Mary Stamm, as personal representative of the Estate of Carl A. Stamm, IV, is suing the Village of Fowlerville and Frederick Miller, an officer in the Fowlerville Police Department (collectively the "defendants"). The case arises out of a police chase, during which Carl Stamm was riding a motorcycle and died after he crashed into Officer Miller's vehicle. (Dkt. 1). Plaintiff brings claims of (1) unlawful use of deadly force in violation of the Fourth Amendment; (2) violation of the

decedent's substantive due process rights; and (3) wrongful death under M.C.L § 600.2922.

Before the Court are the parties' cross-motions for summary judgment.  Defendants argue that judgment should be entered in their favor because Officer Miller is entitled to qualified immunity and because liability cannot be imputed to the municipal defendant.  They also seek summary judgment with respect to some of plaintiff's claims for damages.  (Dkt. 16).

Plaintiff seeks summary judgment arguing that the facts, even construed in the light most favorable to defendant, show that Officer Miller used unconstitutional force and that Fowlerville is responsible for Officer Miller's wrongdoing.  (Dkt. 18).

For the reasons set forth below, the Court denies plaintiff's motion for summary judgment and denies in part and grants in part defendants' motion for summary judgment

I. Facts

   A. The Events of May 16, 2011

On May 16, 2011, after spending an evening with his grandparents, Carl Stamm went to his friend Erik King's house in

Brighton, Michigan.  While at this house, Stamm was served alcohol and became intoxicated.  He left King's house at around four in the morning on his motorcycle heading to his home in East Lansing.  (Dkt. 16-2).  These facts are not in dispute.

At about 4:20 a.m., on Interstate 96, near the Mason Road overpass in Livingston County, Livingston County Sheriff's Deputy Ray Marino recorded Stamm riding his motorcycle at 104 miles per hour. The speed limit along that stretch of road, which is a three-lane highway, is 70 miles per hour.  Deputy Marino activated his overhead lights, but instead of slowing down, Stamm increased his speed. Deputy Marino notified his central dispatch that he was in pursuit of a vehicle that was not stopping.  Central dispatch informed Ingham County law enforcement of the chase because the county line was just a few miles ahead of where Deputy Marino was on the highway.

The parties provided a video of the subsequent pursuit.[1]  Video taken from Deputy Marino's vehicle shows Stamm maneuvering around

---

[1] While the time stamps from the two different videos do not match up, Deputy Chad Sell of the Livingston County Sheriff's Department determined how the times stamps in the two videos relate.  To remain consistent, the Court will use the times as they appear in Deputy Marino's video.

3

several cars and trucks on the highway.[2]  About ten seconds into the chase, the highway changes from a six-lane to a four-lane highway. (Dkt. 16-5 at 14:18:37).  At one point during the chase, Deputy Marino was travelling 124 miles per hour, but Stamm was still able to accelerate away from the patrol car.  (*See* id.)

After central dispatch contacted Ingham County, audio records reveal that Officer Miller, of the Fowlerville Police Department (the "Department"), responded that he was traveling down a ramp to the highway ahead of the pursuit.  (Dkt. 16-8).  Deputy Marino testified that because Stamm was only being pursued for speeding, once he reached the Ingham County line, he would have terminated the pursuit. (Dkt. 18-10 at 14).  On the audio recording, Deputy Marino instructed Officer Miller to "jump on now, get in the right lane, and turn on your overheads."  Officer Miller responded that he was "going to try and stay in front of him."  (Dkt. 16-8 at 00:30-00:44).

Officer Miller's in-car camera switches on at approximately 4:20:14 a.m.  Officer Miller turned his sirens and emergency lights on and travelled on the highway in the right lane at about 36 miles per

---

[2] Deputy Sell testified that Deputy Marino's video shows Stamm passing approximately 11 vehicles.

hour.  By 4:20:20, his vehicle reached a peak speed of 43 miles per hour and then began to slow down.   At this point, video from Deputy Marino's car confirms that Stamm's motorcycle was also in the right lane and remained there for the next several seconds.   At 4:20:24, Officer Miller's car began to move into the left lane just as Stamm began to occupy the left lane.  For about the next five seconds, Officer Miller's vehicle straddled the line dividing the two lanes.  About half way over into the left lane, at 4:20:30, Officer Miller pressed the brakes, and his vehicle shifted back to the right, at which point Stamm's motorcycle crashed into the back left side of the car.  The video from Officer Miller's vehicle shows that he applied his brakes several times in the sixteen seconds he was involved in this incident.  (Dkt. 16-6).

The moment of impact cannot be seen from Deputy Marino's video.   At approximately 4:20:23, Officer Miller's vehicle's lights appeared ahead.   As Deputy Marino approached, he slowed down rapidly, coming to a stop behind skid marks and Stamm's motorcycle on the side of the road.

Upon impact, Stamm was thrown from his motorcycle. His head struck the left "C Pillar"[3] of the patrol car and he fell to the pavement eventually sliding on to the median on the left side of the highway. At the scene of the accident, Stamm appeared to be unconscious and barely breathing. He was declared dead shortly thereafter.

Immediately following the accident, Deputy Chad Sell, of the Livingston County Sheriff's Department, was called to the scene to investigate. Deputy Sell concluded his investigation and issued a report on May 23, 2011. He noted that "based on the initial circumstances of the vehicle pursuit by Deputy Marino, the use of deadly force by Officer Miller was not warranted." (Dkt. 16-3 at 2). As part of this analysis, Deputy Sell determined that Stamm was about 1344 feet from Miller's vehicle when Officer Miller activated his lights. He calculated that if Stamm had begun to slow down upon seeing the lights, he would have needed 809.9 – 879.91 feet to potentially avoid contact with the patrol vehicle. (Id. at 24). In his investigation, Deputy Sell found no evidence that Stamm used his brakes in the several seconds leading up to the crash. (Dkt. 16-4 at 4).

---

[3] The metal portion of the car between the rear windshield and the back-seat window.

Toxicology reports conducted after the accident show that Stamm had a blood alcohol level of .10 and a urine alcohol level of .21. (Dkt. 16-12). This is slightly greater than the amount of alcohol in the blood for him to be determined legally intoxicated.

### B. Evidence of Officer Miller's Intent

Officer Miller's intent is in dispute. Officer Miller testified that at the time he entered the freeway, he did not know what the purpose of the pursuit was – just that a motorcycle was traveling over 100 miles per hour. He understood that Deputy Marino instructed him to remain in the right lane so the motorcycle moving at a high speed would be able to pass him, and he could then join the pursuit. (Dkt. 18-12 at 34-36).

Plaintiff argues that Officer Miller intended to physically block Stamm with his vehicle pointing to Officer Miller's final words before the crash, when he said that he was "going to try and stay in front of him," as well as video showing Officer Miller staying in the right lane for about ten seconds after he saw the motorcycle behind him, then braking and slowly moving to the left lane. (Dkt. 18-12 at 97-98; Dkt. 16-6). Plaintiff also argues that Officer Miller's deposition testimony that he intended to let Stamm go by is inconsistent with the fact that he

did not communicate this change in plan (that he was no longer going to try to stay in front of Stamm) on the radio. (Dkt. 18-13 at 79-82).

Defendants argue that the evidence supports a finding that Officer Miller was attempting to get out of Stamm's way when the collision occurred. Their argument relies on Deputy Sell's findings that Officer Miller and Stamm's decisions to move to the left lane could have occurred simultaneously given the speed they were traveling and their reaction time. (Dkt. 18-13 at 126-27). Defendants also point to Officer Miller's testimony, in which he states that he was moving to the left lane so he could yield the right lane to Stamm and join the pursuit, and that he didn't notice Stamm was behind him in the left lane until he had already moved. (Dkt. 16-9 at 3-4; Dkt. 18-14 at 13 & 17).

C. Evidence Regarding Officer Miller's Reasonableness

Plaintiff provides additional evidence to support the unreasonableness of Officer Miller's actions.[4]   Deputy Marino, for

---

[4] Ernest Burwell, a former member of the Los Angeles County Sheriff's Department, submitted an affidavit stating that Officer Miller's actions "amounted to a rolling roadblock of a motor vehicle and should not have been used" since fatal injury was foreseeable. (Dkt. 18-8). His affidavit references an attached list of "qualifications and work on this matter," but no such attachment was provided to the Court. Defendants object to the use of Burwell's testimony because it was not disclosed to them until the filling of plaintiff's response to this motion. Regardless, the Court will not consider Burwell's statements in deciding this motion as plaintiff has

example, testified that he believed a rolling blockade would not have been appropriate under the circumstances of the pursuit. (Dkt. 18-10 at 212. Geoffrey Alpert, a professor in criminology and use-of-force, reached the following conclusions:

- Officer Miller's involvement with the chase was against policy because he could not balance the need to apprehend the suspect with the risks of the pursuit given his lack of knowledge of the purpose of the chase.

- Officer Miller established a rolling road block driving at or under 40 mph which was an unreasonable tactic.

- Officer Miller's actions (and the County's failure to train) were the cause of the accident.

(Dkt. 18-9). [5]

### D. Evidence Regarding the Village of Fowlerville's Alleged Liability

In February 2006, Officer Miller underwent a psychological evaluation which found he was "moderately deficient" in "judgment" (including life and death situations) and "problem solving." In an evaluation conducted by his supervisor at the time, Chief of Police Gary

---

failed to establish Burwell as an expert in the field of use-of-force tactics pursuant to Fed. R. Civ. P. 26(a)(2)(B).

[5] Defendants also object to plaintiff's use of Professor Alpert's expert testimony because it was not disclosed to them until the filing of plaintiff's response brief. Even if the Court were to ignore Alpert's report in its entirety, it would still come to the same conclusion regarding the parties' motions for summary judgment.

Goss noted he was unsure whether Officer Miller had the emotional stability to perform in stressful situations and he was concerned about whether Officer Miller could restrain himself from overreacting.   In March 2006, Psychologist Linda Forsberg said that Officer Miller's problem-solving abilities were not adequate for complex situations and that he could not be fully rehabilitated.  In one session with Forsberg, Officer Miller described the role of the police as "judge, jury, and executioner." (Dkts. 18-2 & 18-3).

Chief Thomas Couling, Chief Goss's successor, testified that the Department has only four officers, and he did not recall whether he had ever seen the above-mentioned performance evaluation conducted by Chief Goss.  Chief Couling testified that he saw Forsberg's psychological evaluation.  He testified that additional training would be appropriate following such conclusions and that there would be a record if any such training took place.  Chief Couling also explained that the Fowlerville Police Department did not conduct annual performance reviews. Instead, given the small size of the Department, he monitored performance informally and would address problems as they arose.  He never noticed a problem with Officer Miller that would have warranted

the need for additional supervision or training.  Chief Couling did not recall specifically addressing Officer Miller's statement about feeling that the police are "judge, jury, and executioner."  (Dkt. 18-11 at 10-13, 19, 29-31).

Professor Alpert also reached the following conclusions regarding the County's alleged failure to train and supervise Officer Miller:

- If an officer does not possess the critical skills of decision making and tactics of pursuit driving and the chief officer does not provide appropriate training and allows an officer to perform those tasks, then the chief officer and government is deliberately indifferent.

- Chief Goss… was 'unsure' about Officer Miller's ability to exercise restraint and use the minimum amount of force to handle a given situation.  [Chief Couling] was also aware or should have been aware… that Officer Miller had limited cognitive abilities in complex tasks.

- [O]fficers were provided a pursuit policy that was explained but the content was not tested.

(Dkt. 18-9 at 4).

The Department policy acknowledges that a rolling roadblock, in most situations, is a use of deadly force.  (Dkt. 18-4).  The policy defines a roadblock as:

The establishment of a barrier across a part of the traveled portion of a roadway.  This barrier may be moving (as in the case of vehicles placed in front of a fleeing vehicle) or

> stationary. Roadblocks are sometimes established using
> police vehicles as blocking devices.

(Id.) Such a tactic is only permissible as a "last resort measure [and] requires[s] the prior approval and/or direction of the supervisor on duty." The roadblock must be established "where it should not surprise the violator" as the violator should be given the time and space to bring the vehicle to a stop. "Rolling roadblocks are discouraged" yet still permissible under these policies. The policy also notes that motorcycles, in particular, require additional considerations because they are more easily de-stabilized. (Dkt. 18- 5 at 6; Dkt. 18-11 at 48-49). Chief Couling testified that in June 2009, officers read over the policy, were presented it during training, and were asked if they understood it or had any questions. All of the officers responded that they understood the policy. (Dkt. 18-11 at 34-35).

Chief Couling testified that Fowlerville officers did not receive road training on high speed pursuits. (Id. at 59-61). Officer Miller testified that he received such training in 1972, and attended a 2010 Vehicle Operations Refresher Course that included high speed driving tests on a course with cones. He also testified that he never received

on-the-road training from the Department on high speed pursuits. (Dkt. 18-12 at 60-62).

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248. The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III. Analysis

### A. Plaintiff's Motion For Partial Summary Judgment[6]

Plaintiff moves for summary judgment arguing that there is no issue of material fact as to whether (1) Officer Miller used

---

[6] Plaintiff's motion for summary judgment addresses the complaint's Fourth Amendment excessive force claim and the municipal defendant's alleged liability under *Monell*. It does not address plaintiff's Fourteenth Amendment or wrongful death claims. The Court will construe plaintiff's motion as a motion for partial summary judgment.

unconstitutional force; or (2) whether Fowlerville is responsible for Miller's wrongdoing under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978). Viewing the evidence in the light most favorable to defendants, given Officer Miller's testimony about his intent to stay in front of Stamm and Deputy Sell's conclusion that Officer Miller and Stamm could have decided to occupy the left lane at the same time, a reasonable juror could conclude that Officer Miller was attempting to get out of Stamm's way and, thus, no seizure occurred. *See supra* Section III(B)(i); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844-45 (1998) (a seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied.") If there was no seizure, there can be no constitutional violation, and with no constitutional violation, the municipality cannot be held liable. *See Monell*, 436 U.S. 658; *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("because the jury found no constitutional violation by the individual defendants, the county could not have been found liable under *Monell* for an allegedly unconstitutional custom or policy."); *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014) ("if

no constitutional violation occurred in the first place, a *Monell* claim cannot be supported.")

Plaintiff's motion for partial summary judgment is denied because a material question of fact remains regarding whether Officer Miller intended to block Stamm.

### B. Whether Officer Miller is Entitled to Qualified Immunity

Qualified immunity is an affirmative defense available to government officials performing discretionary functions. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Whether a defendant is entitled to qualified immunity "generally turns on the objective legal reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The plaintiff bears the burden of proving that a defendant is not entitled to qualified immunity. *Gardenshire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

Courts in this Circuit employ a two-step analysis to determine whether a defendant is entitled to qualified immunity. First, "viewing the facts in the light most favorable to plaintiff, we determine whether the allegations give rise to a constitutional violation." *Shreve v. Franklin Cty.*, 743 F.3d 126, 134 (6th Cir. 2014). Second, "we assess whether the right was clearly established at the time of the incident." *Id.* A court may undertake either step of the analysis first. *Pearson v. Callahan*, 555 U.S. 223 (2009).

The Court applies the same summary judgment standard to a motion based on qualified immunity as in other cases: the facts must be viewed in the light most favorable to the non-moving party and genuine disputes of material fact cannot be resolved in favor of the movant. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014).

1. Whether the Facts Give Rise to a Constitutional Violation

a) Whether a Seizure Occurred

To prevail on a claim alleging a violation of the Fourth Amendment due to an unreasonable seizure, plaintiff must first show that a seizure, an intentional acquisition of physical control, occurred. *See Lewis*, 523 U.S. at 844-45 (1998). "A seizure occurs even when an

unintended person or thing is the object of the detention or taking, but the detention or taking must be willful." *Horta v. Sullivan*, 4 F.3d 2, 9-10 (1st Cir. 1993).  The Fourth Amendment "only protects individuals against 'unreasonable' seizures, not seizures conducted in a 'negligent' manner." *Dodd v. City of Norwich*, 827 F.2d 1, 7-8 (2d Cir. 1987) (citing *Daniels v. Williams*, 474 U.S. 327 (1986) and *Davidson v. Cannon*, 474 U.S. 344 (1986)).

No seizure has occurred, for example, "where a 'pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit' but accidentally stopped the suspect by crashing into him.  *Lewis*, 523 U.S. at 844-45 (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)).  A roadblock that completely blocks the road, on the other hand, constitutes a seizure even if it is designed to give the driver an opportunity to stop before crashing.  *Brower*, 489 U.S. at 598-99.  As the Court in *Brower* noted:

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental

termination of freedom of movement *through means intentionally applied*.

*Id.* at 596-97 (emphasis in original). The Court further determined that:

> We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped.

*Id.* at 599.

At oral argument, the defendants directed the Court to *White v. Tamlyn*, 961 F. Supp. 1047 (E.D. Mich. 1997), where the district court found the use of a rolling roadblock was not a seizure but rather an attempt to "stop the suspect through a display of authority." *Id.* at 1058. In *Tamlyn*, plaintiff testified that she was being pursued by police on the highway with one police car on her left and another on her right. *Id.* A third police car passed the car already on plaintiff's left and pulled in front of plaintiff's vehicle, at which point plaintiff struck the vehicle in front of her. *Id.*

This case is distinguishable from *Tamlyn*. In the light most favorable to plaintiff, a reasonable juror could conclude that Officer

Miller did not merely attempt to stop plaintiff by a show of authority, but intended to stop plaintiff by use of physical force intentionally causing the collision.  Deploying a rolling roadblock, where a police vehicle gets in front of the subject, *and travels roughly the same speed as*, a pursued vehicle, would not necessarily constitute a seizure.  *See Carter v. Lucas*, 30 F.3d 128 at *2-4 (4th Cir. 1994) ("[a] rolling roadblock is a procedure whereby a police vehicle takes up a position in front of, traveling in the same direction and at roughly the same speed as, the pursued vehicle… [this tactic] is not designed to cause a physical impact.")  Here, the evidence shows Officer Miller was travelling, *at his fastest*, 43 miles per hour on a highway with a 70 mile per hour speed limit and in front of vehicle he knew was traveling in excess of 100 miles per hour.  Evidence from Officer Miller's vehicle shows that Miller got in front of Stamm while Stamm was changing lanes and that Miller braked several times while doing so.[7]

Viewing the facts in the light most favorable to the non-moving party, plaintiff has raised an issue of material fact.  A reasonable juror could conclude that Officer Miller terminated Stamm's freedom of

---

[7] In light of how quickly the events in this case unfolded, the Court is not persuaded that Officer Miller's failure to announce his decision to change lanes is indicative of his intent to cause Stamm to crash into his patrol vehicle.

movement through means intentionally applied and that Stamm was "stopped by the very instrumentality set in motion or put in place to achieve that result." *Brower*, 489 U.S. at 599; *see also Hawkins v. City of Farmington*, 189 F.3d 695, 701-02 (8th Cir. 1999) (holding that a reasonable jury could find that the use of a rolling roadblock in pursuit of a motorcycle constituted an intentional seizure).

b) Whether Officer Miller's Actions Were Unreasonable

In analyzing the reasonableness of an officer's seizure, the Court must examine the "totality of the circumstances" and must judge the actions from the perspective of a reasonable officer on the scene without regard to underlying intent or motivation. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Graham*, 490 U.S. at 396-97.  Primary among the factors courts consider in making this determination are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

"[Deadly force] may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect

poses a significant threat of death or physical injury to the officer or others." *Garner*, 471 U.S. at 11; *see also Terranova v. New York*, 144 Fed. App'x 143, 146 (2d Cir. 2005) ("the use of deadly force to stop an individual who does not pose a threat of serious injury to others constitutes an unreasonable seizure under the Fourth Amendment."); *Brower*, 489 U.S. 593.

Defendants argue this case is similar to *Scott v. Harris*, 550 U.S. 372 (2007), where a high speed chase of a car concluded when a police vehicle rammed the car from behind causing it to leave the road and crash. *See id.* That chase took place on a two-lane highway with businesses along the side of the road. *Id.* at 375. The Supreme Court ruled that "a police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Id.* at 386.

Defendants also point to *Abney v. Coe*, 493 F.3d 412 (4th Cir. 2007), where the court ruled that an officer in pursuit of a motorcyclist acted reasonably when he struck him to protect the safety of others. *Id.* at 414, 420-21. In *Abney*, the motorcyclist was speeding down a two-

lane road and passing vehicles while crossing the double lines into oncoming traffic, running at least one vehicle off the road in the process. *Id.* at 414.

In both *Abney* and *Scott*, the threat of serious injury to others was clearly established. In both of those cases, the pursued vehicle was fleeing along a two-lane road with traffic coming in the opposite direction. *Id.*; *Harris*, 550 U.S. at 375. In *Harris*, the pursuit also took place in a business area where there was pedestrian traffic. *Harris*, 550 U.S. at 375. Here, Stamm was being pursued at 4:20 a.m. along a highway six and then four lanes wide, with a large median dividing him from oncoming traffic and no pedestrians or businesses in sight. During this pursuit, the greatest risk was to Stamm, who was on a motorcycle which is less stable and significantly lighter than the cars and trucks on the highway. Indeed, when Stamm's motorcycle crashed into Officer Miller's patrol car, Officer Miller was uninjured.

Plaintiff points to *Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011). In *Walker*, a police vehicle intentionally rammed a motorcycle from behind while pursuing it more than 200 feet into an open field. *Id.* The Sixth Circuit found that such a pursuit was "patently

distinguishable" from *Harris*, and the officer's actions were unreasonable because the fleeing motorist posed no threat of serious harm to the officers or others. *Id.* at 503. Here, the motorcyclist was still on the road when the crash occurred, having maneuvered around approximately eleven vehicles, potentially putting those drivers at risk.

This case is most analogous to *Hawkins*, 189 F.3d 695. In *Hawkins*, an officer positioned himself on the median of a highway awaiting a motorcycle that was being pursued by other officers. *Id.* 698. The officer admitted that when he saw an approaching motorcycle (which, it turns out, might not have been the motorcycle being pursued), he intended to get the driver of the motorcycle to slow down or stop by pulling slowly into the passing lane with his emergency lights on. *Id.* at 699. As the officer was moving into that lane, he lost sight of the motorcycle, and a collision occurred. *Id.* at 700. The court concluded that because the defendant acted intentionally and because there were no other vehicles near the site of the crash, there was sufficient evidence for a reasonable juror to find that an officer using a rolling roadblock acted unreasonably. *Id.* at 702. Here, while the motorcycle passed other vehicles while Deputy Marino was pursuing him, at the

time and place of the collision with Officer Miller, there are no vehicles to be seen in the immediate vicinity.   Deputy Marino testified that under these circumstances he believed the use of deadly force was unreasonable.   Deputy Sell's report also notes that the use of deadly force was  unreasonable under the circumstances.

Viewing the evidence in the light most favorable to plaintiff, there is a question of fact as to whether Stamm posed a significant threat to others, and a reasonable juror could conclude that deadly force was not necessary under the circumstances and that Officer Miller's actions were unreasonable.

### 2. Whether Officer Miller's conduct was clearly established as unreasonable

Defendants argue that even if Officer Miller's actions were unreasonable, he did not violate a clearly established right because the case law has never established that using a rolling roadblock under these circumstances constitutes unreasonable use of force.

In order to determine whether a constitutional right is clearly established, the Court is limited to relying on decisions from the United States Supreme Court, the Sixth Circuit, district courts within the Sixth Circuit, and finally, decisions from other circuits.  *Higgason v.*

*Stephens*, 288 F.3d 868, 876 (6th Cir. 2002).  Lower courts must not define the right at "a high level of generality." *Ashcroft v. Kidd*, 131 S.Ct. 2074, 2084 (2011).  Rather, courts must define the right "on the basis of the specific context of the case." *Tolan*, 134 S.Ct. at 1866.  But "courts must take care not to define a case's context in a manner that imports genuinely disputed factual propositions." *Id.* (internal citations and quotations omitted).

While statements of general applicability typically do not apply in determining whether a constitutional violation was clearly established, "in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199. (2004) (citations omitted).  The Supreme Court has held that such general statements regarding unconstitutional conduct can put officials "on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  The determinative issue is whether the officer had "fair warning that his conduct deprived [the plaintiff] of a constitutional right." *Id.* at 740.

In *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005), the Sixth Circuit held that "a suspect fleeing in a car that has never posed a danger to anyone has the clearly established right not to be seized with deadly force." *Id.* at 777. In a separate case, the Sixth Circuit found, albeit months after the accident in this case, that it has been "*settled for a generation* that, under the Fourth Amendment, 'where a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'" *Walker*, 649 F.3d at 503 (quoting *Garner*, 471 U.S. 1 (1985) (emphasis added).

The court in *Walker* explained:

> Nor does it matter that, at the time of [the fleeing motorist's] actions, there were few, if any, reported cases in which police cruisers intentionally rammed motorcycles. It is only common sense—and obviously so—that intentionally ramming a motorcycle with a police cruiser involves the application of potentially deadly force. This case is thus governed by the rule that "general statements of the law are capable of giving clear and fair warning to officers even where the very action in question has not previously been held unlawful."

*Walker*, 649 F.3d at 503-04 (quoting *Cupp*, 430 F.3d at 776-77 (internal quotation marks omitted)).

At the time of Officer Miller's use of force, there were no other vehicles in sight.  Here, the risk of harm to others is not significant, particularly where Stamm is on a motorcycle and not in a car.  It has been clearly established that the use of deadly force in a high speed pursuit is unconstitutional where failing to use such force poses little threat to the safety of others.  *See Cupp*, 430 F.3d 777; *Lytle v. Bexar Cnty., Tex.,* 560 F.3d 404, 417 (5th Cir. 2009) ("It has long been clearly established that… it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others."); *see also Sample v. Bailey*, 409 F.3d 689, 699-700 (6th Cir. 2005) ("regardless of whether the incident took place at day or night, in a building or outside, whether the suspect is fleeing or found, armed or unarmed, intoxicated or sober, mentally unbalanced or sane, it is clearly established that a reasonable police officer may not shoot the suspect unless the suspect poses a perceived threat of serious physical harm to the officer or others.")

For these reasons, defendants' motion for summary judgment on the basis of qualified immunity is denied as there remain issues of material fact to be resolved by the jury.

### C. Whether Plaintiff's Fourteenth Amendment Substantive Due Process Claim Should be Dismissed

Defendants argue that, as a matter of law, plaintiff has failed to show that Officer Miller's actions "rise to the conscience-shocking level" and, thus, do not give rise to a substantive due process claim. (Dkt. 16 at 21). Plaintiff concedes that since she is proceeding on an alleged violation of the Fourth Amendment claim, there is no basis to consider a substantive due process claim. If plaintiff is pursuing a substantive due process claim, the test established in *Darrah v. City of Oak Park*, 255 F.3d 301 (6th Cir. 2001), is whether the alleged conduct "shocks the conscience." *Id.* (quoting *Lewis*, 523 U.S. at 846). Nonetheless, plaintiff has waived her Fourteenth Amendment claim because she abandoned it in her responsive brief and at oral argument. *See Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 205-06 (6th Cir. 1998); *Sanders v. Village of Dixmoor, III*, 178 F.3d 869, 870 ("Because [plaintiff did not notify the trial court of the theory he now advances… he has waived any such claim there and on appeal.") And even if she did not, plaintiff has failed to point to any facts that show Officer Miller's actions shocked the conscience.

Accordingly, plaintiff's Fourteenth Amendment substantive due process claim will be dismissed.

### D. Whether the Municipality Can be Held Liable for Officer Miller's Actions

#### 1. Whether the Municipality Ratified Plaintiff's Actions

"Local governing bodies… can be sued directly under § 1983… where… the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Monell*, 436 U.S. at 690.   Plaintiff argues that there was an explicit policy in place that plaintiff was following the night of this incident.  This is not consistent with the facts in this case.  The Department's policy, for example, expressly states that rolling roadblocks, while permitted, are discouraged and only to be used as a "last resort."

Plaintiff compares this case to one in which a court found a municipality liable because it had a policy of tasering verbally non-compliant prisoners and the officer tased a verbally non-compliant prisoner.  (Dkt. 42 at 17) (citing *Hublick v. Cnty. of Ostego*, 2014 WL 495403).  That case is easily distinguished from this one.  In *Hublick*, the defendant officer was following an explicit policy of tasering non-

compliant prisoners.  *Id.* at *9.  Here, the Department's "last resort" policy is not *per se* unconstitutional because of the manner in which it limits the use of a rolling roadblock.[8]

Plaintiff also argues that defendants ratified Miller's actions after the fact, because the Department did not conduct an internal review or fill out the proper forms in accordance with its own policies.  This argument is not supported by either the facts or the law.  First, the record of Deputy Sell's post-accident report shows that the Department complied with a meaningful after-the-fact investigation.  Furthermore, to find *Monell* liability, it is not enough to show a violation of internal policy or a failure to investigate after-the-fact.  Rather, the plaintiff must also demonstrate that such a failure "[was] either intentional or at the least, grossly negligent" and, therefore, ratified the unconstitutional conduct.  *See Tompkins v. Frost*, 655 F.Supp. 468, 472 (6th Cir. 1987).  Plaintiff has failed to provide any legal support for the proposition that a failure to follow internal policies is evidence of ratification, and she

---

[8] Plaintiff also suggests that the failure to define "last resort" in its rolling roadblock policy indicates an explicit endorsement of Officer Miller's actions.  Plaintiff provides no support for this argument.

has failed to provide any evidence that shows the municipality's actions were willful or grossly negligent.

For these reasons, plaintiff has failed to raise a question of fact as to whether the Department ratified Officer Miller's actions through a pre-existing policy or by a failure to investigate the incident.

### 2.  Failure to Train

Municipal liability need not be based on an explicitly articulated official policy or a post-incident ratification:

> [A]lthough the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell*, 536 U.S. at 690-91.

In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court clarified this further, explaining that failure to train could constitute an official policy when it "evidences a deliberate indifference to the rights of its inhabitants." *Id*. at 389.  The Court explained:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different

> training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390.

"[A] systematic failure to train police officers adequately is a custom or policy which can lead to municipal liability." *Gregory v. City of Louisville,* 444 F.3d 725, 753 (6th Cir. 2006) (citing *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)). Under a "failure to train" theory of municipal liability, plaintiff must show that (1) a training program is inadequate to the tasks that the officers must perform; (2) the inadequacy is the result of the municipality's deliberate indifference; and (3) the inadequacy is closely related to or actually caused the plaintiff's injury. *Plinton v. Cnty. of Summit,* 540 F.3d 459, 464 (6th Cir. 2008) (citing *City of Canton,* 489 U.S. at 389-91).

First, plaintiff has failed to establish that the Department's creation and distribution of its policy on pursuits was inadequate. Plaintiff argues erroneously that "Miller had no training for freeway pursuits." (Dkt. 18 at 20). The record shows, to the contrary, that in

2009, officers in the Department were provided the policy on high speed pursuits.   It was presented during training, and the officers were required to read the policy.  They were then asked if they understood it or had any questions.   All of the officers, including Officer Miller, responded that they understood the policy. (Dkt. 18-11. at 34-35).  The officers were told to only use rolling roadblocks in a way that would give the pursued vehicle an opportunity to stop and were instructed to only use such a tactic as a "last resort."  They were also instructed to seek approval from a supervisor before initiating any type of roadblock.

Even if the Court were to rely on Professor Alpert's testimony, while he notes that training on high-speed pursuits is necessary, he does not establish or explain how the training the Department provided was inadequate.  (Dkt. 18-9).  Interestingly, he testified that the Department's pursuit policy was "balanced."  (Id. at 4).  He also believes that periodic testing is necessary, but this policy was provided about two years prior to this incident, and he reaches no conclusion about whether the training needed to be more frequent than that.  Plaintiff has failed to set forth any legal authority to show that the Department's training was inadequate.

Even if the Court were to find that defendant's training was inadequate, plaintiff has still failed to establish that the Department was deliberately indifferent.

"[D]eliberate indifference can be demonstrated in two ways: through evidence of prior instances of unconstitutional conduct demonstrating that the municipality had notice that the training was deficient and likely to cause injury but ignored it, or through evidence of a single violation of federal rights, accompanied by a showing that the municipality had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 942 (M.D. Tenn. 2012) (citing *Harvey v. Campbell Cnty., Tenn.*, 453 Fed. App'x 557, 562-63 (6th Cir. 2011)).   Plaintiff has not alleged that there have been any prior instances of unconstitutional conduct at the Fowlerville Police Department. "Deliberate indifference based on a single violation of rights requires a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Okolo*, 892 F.Supp. 2d at 943.   Plaintiff has provided

the Court with *no* legal authority to support the argument that defendant's training was reckless or grossly negligent.

For these reasons, defendant Fowlerville cannot be found liable based on a failure-to-train theory.

### 3. Failure to Supervise

Failure to supervise, as with failure to train, triggers municipal liability where "the need for more adequate supervision was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great that the [municipality] as an entity can be held liable." *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989).

Here, Officer Miller was evaluated and found to be lacking in key judgment that would be necessary in life or death situations. He also made concerning statements about the police being "judge, jury, and executioner." However, this statement was made and these evaluations were conducted in 2006, about five years prior to the incident in this case. (Dkts. 18-2 & 18-3). Chief Couling acknowledged that those kinds of statements and reviews would warrant additional supervision. Given the small size of the Department, Chief Couling would conduct

evaluations informally and would only intervene with more formal supervision if there were a reason to do so.  In the five years since the evaluations in the record, there is no evidence that Officer Miller showed signs of lacking judgment nor is there any evidence that additional supervision was required.

Plaintiff has failed to demonstrate that the Department's supervision of Officer Miller was constitutionally inadequate.  All federal claims against the Village of Fowlerville will be dismissed because plaintiff has failed to raise a material question of fact such that a reasonable juror could find it liable.

E. Whether Plaintiff Can Recover Damages for Pain and Suffering, Loss of Society and Companionship, and Punitive Damages.

1. Pain & Suffering

Defendants argue that under Michigan law, damages for pain and suffering may only be recovered to the extent the decedent experienced conscious pain between the time of injury and the time of death.  MCL § 600.2922(6).  Michigan state law for damages applies in a § 1983 case. *See   Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 598-99 (6th Cir. 2006)

(applying Michigan state law to damages following a default judgment in a § 1983 case).

Plaintiff makes a series of erroneous policy arguments that state law should not apply in a case of this nature. Plaintiff appears to argue that if there are no pain and suffering damages then there are no damages at all. In the Tenth Circuit case plaintiff cites, the court found that pain and suffering damages were appropriate but only *to the extent they occurred before death*. *Berry v. City of Muskogee, Okl.*, 900 F.2d 1489, 1507 (10th Cir. 1990).

Here, the undisputed evidence is that following the crash, Stamm was found to be unconscious and barely breathing and was declared dead shortly thereafter. Because plaintiff has provided the Court with no evidence of conscious pain and suffering and because Michigan law and §1983 only permit injuries for damages that occurred while conscious, the Court will not permit plaintiff to recover pain and suffering damages. *See* MCL § 600.2922(6); *Blaty*, 454 F.3d at 598-99

### 2. Loss of Society and Companionship

Defendants also argue that plaintiff is not entitled to any loss of society and companionship damages. While there is a split in the

circuits, the Sixth Circuit has made it clear that § 1983 "provides a cause of action which is *personal* to the injured party." *Purnell v. City of Akron*, 925 F.2d 941, 948 n. 6 (6th Cir. 1991); *see also Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984) ("[b]y its own terminology, the statute grants the cause of action to the party injured."); *Broadnax v. Webb*, 892 F. Supp. 188, 190 (E.D. Mich. 1995) (acknowledging that the Sixth Circuit did not recognize a loss of companionship claim by the children of a parent who suffered a constitutional deprivation under § 1983).

Plaintiff, however, has also brought a wrongful death claim under Michigan law which *does* permit damages for the loss of companionship. *See Thorn v. Mercy Memorial Hosp. Corp.*, 281 Mich. App. 644, 666 (2008); *Lamson v. Martin*, 182 Mich. App. 233 (1990).

### 3. Punitive Damages

Finally, defendants argue that plaintiff is not entitled to punitive damages.  Punitive damages in a § 1983 case are only available "if defendants conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 US 30, 56 (1983).  It is

within the discretion of the fact-finder to determine "the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent." *Gordon v. Norman*, 788 F.2d 1194, 1199 (6th Cir. 1986).  For the reasons set forth in further detail above, plaintiff has raised a material question of fact as to whether Officer Miller had ill-motive or whether his conduct was recklessly indifferent to Stamm's federally protected rights.

Punitive or exemplary damages, however, are not available under Michigan's wrongful death law.  *Fellows v. Superior Prods. Co.*, 201 Mich. App. 155, 157-58 (1993) (quoting *In re Disaster at Detroit Metro. Airport on Aug. 16, 1987,* 750 F. Supp. 793, 805 (E.D. Mich. 1989).

At this stage in the case, plaintiff may pursue punitive damages on her surviving constitutional claim against Officer Miller.

IV.   Conclusion

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED that:

Plaintiff's motion for partial summary judgment (Dkt. 19) is DENIED.

Defendants' motion for summary judgment is DENIED IN PART and GRANTED IN PART.  (Dkt. 16).

Defendant Officer Miller is not entitled to qualified immunity because there remain issues of material fact to be resolved by a jury.

Plaintiff's Fourteenth Amendment claim is DISMISSED as abandoned.

Plaintiff's constitutional claims against defendant Village of Fowlerville are DISMISSED.

Plaintiff shall not be permitted to pursue pain and suffering damages under either her state or federal claims pursuant to MCL § 600.2922(6) and *Blaty*, 454 F.3d at 598-99.  Plaintiff may continue to seek loss of companionship damages under her wrongful death claim and punitive damages under her § 1983 claim.

IT IS SO ORDERED.


Dated: April 27, 2015                    s/Judith E. Levy
Ann Arbor, Michigan                    JUDITH E. LEVY
                                                   United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 27, 2015.

<u>s/Felicia M. Moses</u>
FELICIA M. MOSES
Case Manager